# United States Court of Appeals
# for the Fifth Circuit

———————

No. 24-40368

———————

United States Court of Appeals
Fifth Circuit

**FILED**

February 28, 2025

Lyle W. Cayce
Clerk

In the Matter of Matthew J. Kerns,

*Debtor*,

Matthew J. Kerns,

*Appellant*,

*versus*

First State Bank of Ben Wheeler,

*Appellee*.

———————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:23-CV-458

———————————————————

Before Graves, Higginson, and Wilson, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

Debtor-plaintiff Matthew Kerns filed an adversary proceeding alleging that his creditor First State Bank of Ben Wheeler (FSBBW) violated the automatic stay and the bankruptcy discharge when FSBBW contacted a special ranger with the Texas and Southwestern Cattle Raisers Association to report that Kerns had sold cattle he used as collateral for a FSBBW loan, in violation of state law. Because the bankruptcy and district courts properly

No. 24-40368

held that FSBBW's conduct fell within the safe harbor provision of the An-nuzio-Wylie Money Laundering Act, 31 U.S.C. § 5318, we AFFIRM.[1]

For the first time on appeal, Kerns raises a colorable argument as to why the bankruptcy court judge should have recused. Because Kerns knew or should have known of the basis for the recusal since at least 2021 and failed to raise it before the bankruptcy court, he has forfeited this argument.

I.

Glade Creek Livestock, LLC (Glade Creek) entered into a loan agreement with Appellee First State Bank of Ben Wheeler, using equipment and over 200 head of cattle as collateral. The loan was personally guaranteed by Appellant Matthews Kerns, the sole member and manager of Glade Creek. In September 2019, when Glade Creek was experiencing financial difficulties, Kerns contacted FSBBW about a possible loan workout. When conducting an inspection of its collateral, FSBBW noted that some of the equipment and cattle that had served as security for the loan was no longer in possession of the borrower and demanded repayment of the loan in full on November 22, 2019. Kerns acknowledged that he had sold some of the cattle serving as collateral.

Kerns filed for Chapter 7 bankruptcy on November 25, 2019. The bankruptcy court entered a discharge order on February 21, 2020, and on February 24, 2020, the case was closed. In January 2020, while the automatic stay was in place, FSBBW contacted Special Ranger Jimmy Dickson of the Texas and Southwestern Cattle Raisers Association (TSCRA) about theft of their collateral. Special Ranger Dickson conducted an investigation, which

---

[1] The Annuzio-Wylie Money Laundering Act seeks to prevent money laundering by requiring financial institutions to report certain transactions; the safe harbor provision shields financial institutions from liability for such reporting.

later resulted in Kerns being indicted and arrested on charges of hindering a secured creditor, Tex. Penal Code § 32.33(b), in the summer of 2020.[2]

On December 31, 2021, Kerns initiated an adversary proceeding in bankruptcy court, claiming that FSBBW violated the automatic stay, 11 U.S.C. § 362(a), and the discharge injunction, 11 U.S.C. § 524(a)(2), when FSBBW contacted Special Ranger Dickson. Kerns later filed his First Amended Complaint, which added a paragraph asserting that FSBBW was not entitled to immunity under 31 U.S.C. § 5318(g)(3)—the safe harbor provision of the Annuzio-Wylie Act—and cited to provisions of the Code of Federal Regulations relating to banks.[3]

FSBBW then moved for summary judgment, arguing that it cannot be held liable for violating either provision of the Bankruptcy Code cited in the First Amended Complaint because of the § 5318(g)(3) safe harbor provision.[4]

The bankruptcy court granted summary judgment in favor of FSBBW. The court held that the § 5318(g)(3) safe harbor applied because FSBBW is a financial institution that made a voluntary report of a possible crime to local law enforcement that would have otherwise made FSBBW liable under 11 U.S.C. § 362 (violation of the automatic stay) or § 524

---

[2] Section 32.33(b) of the Texas Penal Code states:

A person who has signed a security agreement creating a security interest in property or a mortgage or deed of trust creating a lien on property commits an offense if, with intent to hinder enforcement of that interest or lien, he destroys, removes, conceals, encumbers, or otherwise harms or reduces the value of the property.

[3] The First Amended Complaint also cited to 12 C.F.R. §§ 21.11, 208.63, and 353.3.

[4] FSBBW also argued that its behavior fell within the § 362(b)(1) exception to the automatic stay and that its actions did not violate the discharge order, but the bankruptcy court did not reach those arguments and the parties do not address them on appeal.

(violation of the effect of a discharged debt). Kerns then appealed to the district court, which affirmed the bankruptcy court.

Kerns timely appealed. We have jurisdiction under 28 U.S.C. § 158(d)(1).

## II.

We apply the same standard of review as the district court in reviewing the bankruptcy court's decision. *In re Woerner*, 783 F.3d 266, 270 (5th Cir. 2015) (en banc). We review the grant of summary judgment de novo. *In re Ark-La-Tex Timber Co., Inc.*, 482 F.3d 319, 328 (5th Cir. 2007).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although we "view all facts and draw all reasonable inferences in favor of the non-movant," *Ross v. Judson Independent School Dist.*, 993 F.3d 315, 321 (5th Cir. 2021), "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence," *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (internal quotation marks and citation omitted).

## III.

Kerns, now proceeding pro se, challenges the bankruptcy court's conclusion that the § 5318(g)(3) safe harbor applies to FSBBW's report to Special Ranger Dickson of the TSCRA. Kerns also raises for the first time a recusal challenge. We first address the merits and then turn to the recusal question.

### A.

Kerns argues that the bankruptcy court erred in concluding that §5318(g)(3), the safe harbor provision of the Annuzio-Wylie Act, applies. His

4

No. 24-40368

primary disagreement appears to center on whether a report to a special ranger of the TSCRA triggers the safe harbor provision.[5] FSBBW contends the bankruptcy court correctly ruled that it did. For the reasons that follow, we agree that the bankruptcy court came to the correct resolution.

*i.*

Congress passed the Annunzio-Wylie Act in 1992 to combat money laundering by requiring financial institutions to report any suspicious transactions that may violate any law or regulation. 106 Stat. 3672, Title XV, §§ 1504(d)(1). As part of that statute, Congress included a safe harbor provision to shield financial institutions from all liability stemming from that disclosure. Section 5318(g)(3) provides that:

> Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency or makes a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution who makes, or requires another to make any

---

[5] Kerns also argues, for the first time on appeal, that FSBBW's alleged failure to comply with other provisions of the Annunzio-Wylie Act disqualifies it from claiming safe harbor protection because it did not file a Suspicious Activity Report (SAR) with FinCEN. He also appears to argue that § 5318(g)(3) only applies to filings of SARs. In addition to being contrary to the plain language of the statute, Kerns has forfeited these issues by failing to raise them below. *See Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021).

Kerns makes other arguments in his brief that appear unrelated to the lower courts' opinions before us, including allegations against the District Attorney's Office and policy arguments about elevating the status of banks. Specifically, Kerns raises an argument that allowing FSBBW to pursue criminal charges while the bankruptcy case was pending creates a two-tiered system that prefers FSBBW to other creditors. Although we do not address this argument, we note that we have had occasion to interpret § 32.33(b) of the Texas Penal Code in the context of a bankruptcy case in *In re Fussell*, 928 F.2d 712 (5th Cir. 1991), where we denied a Chapter 7 debtor's request to enjoin a state court criminal prosecution under § 32.33(b). In *Fussell*, we explained that "the fact that restitution effectively grants a preference is irrelevant." *Id* at 717.

No. 24-40368

such disclosure, shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure or any other person identified in the disclosure.

31 U.S.C. § 5318(g)(3). When implementing the Annunzio-Wylie Act, the Board of Governors of the Federal Reserve and the Federal Deposit Insurance Company (FDIC) described the scope of §5318(g)(3) as including reports made to law enforcement. The regulation implemented by the Federal Reserve provides that

> The safe harbor provisions of 31 U.S.C. 5318(g), which exempts any member bank that makes a disclosure of any possible violation of law or regulation from liability under any law or regulation of the United States, or any constitution, law or regulation of any state or political subdivision, covers all reports of suspected or known criminal violations and suspicious activities to law enforcement and financial institution supervisory authorities, including supporting documentation, regardless of whether such reports are filed pursuant to this section or are filed on a voluntary basis.

12 C.F.R. § 208.62(k). The FDIC issued a nearly identical rule:

> The safe harbor provisions of 31 U.S.C. 5318(g), which exempts an FDIC–supervised institution that makes a disclosure of any possible violation of law or regulation from liability under any law or regulation of the United States, or any constitution, law or regulation of any state or political subdivision, cover all reports of suspected or known criminal violations and suspicious activities to law enforcement and financial institution supervisory authorities, including supporting

6

documentation, regardless of whether such reports are filed pursuant to this part or are filed on a voluntary basis.

12 C.F.R. § 353.3.

Reading the statute and regulations in conjunction, for an entity to be entitled to protection under this safe harbor provision, it must be (1) a financial institution that (2) makes a voluntary disclosure of a possible violation of a law or regulation, or makes a disclosure pursuant to § 5318(g) or any other authority (3) to a government agency, law enforcement, or financial institution supervisory authority. *See* 31 U.S.C. § 5318(g)(3); 12 C.F.R. § 208.62(k) and 353.3.

Neither party disputes that FSBBW is a financial institution and that FSBBW made a disclosure of a possible violation of a law—hindering a secured creditor, Tex. Penal Code § 32.33(b). Therefore, the only question we are confronted with is whether the disclosure to a special ranger of the TSCRA falls within the protection of the § 5318(g)(3) safe harbor.

*ii.*

We first address whether the term "law enforcement" includes state and local law enforcement entities, in addition to federal ones. Neither the statute nor the implementing rules make a distinction between federal, state, and local law enforcement. The bankruptcy court, relying on opinions from district courts that have considered the issue over the past twenty years, concluded that reports to state and local law enforcement authorities, in addition to federal ones, fall within the scope of the safe harbor provision. *See, e.g.*, *Gregory v. Bank One Corp. Inc.*, 200 F. Supp. 2d 1000, 1002 (S.D. Ind. 2002) (concluding that § 5318(g)(3) immunity applies "whether the report is made to federal, state, or local authorities"); *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 342 (S.D.N.Y. 2000) ("If [these financial institutions] wish to invoke Annunzio–Wylie protection in cases of suspected credit card fraud (which

are unquestionably covered by the statute), then they should contact local law enforcement directly."); *Urias v. Lolman*, No. 2:15-cv-00794-MCA-GJF, 2016 WL 10543137, at *3 (D.N.M. Apr. 12, 2016) ("In sum, the Act and the related regulations provide immunity to financial institutions from liability arising from the act of reporting suspicious financial activity to federal, state, and local law enforcement authorities."); *Smith v. Fleet Bank*, No. 3:03-cv-1052(DJS), 2005 WL 1490012, at *2 (D. Conn. June 23, 2005) (concluding that § 5318(g)(3) protected the bank from liability for its disclosure of information to local law enforcement about suspected criminal activity).

The conclusion of the bankruptcy court and the district courts that have considered the issue is buttressed by the Federal Reserve's own commentary accompanying the imposition of its regulation in 1996. When responding to comments following its rulemaking procedure, the Federal Reserve explained:

> The Board is of the opinion that the safe harbor statute is broadly defined to include the reporting of known or suspected criminal offenses or suspicious activities, by filing a SAR or by reporting by other means, with ***state and local law enforcement authorities***, as well as with the Agencies and FinCEN.

Membership of State Banking Institutions in the Federal Reserve System; International Banking Operations; Bank Holding Companies and Change in Control; Reports of Suspicious Activities Under Bank Secrecy Act, 61 Fed. Reg. 4338-01 (Feb. 5, 1996) (emphasis added).

While we have not identified any circuit authority on whether §5318(g)(3) includes protection for disclosures made to state and local enforcement, the intent of the safe harbor provision, the language of the statute and accompanying regulations, and the cases interpreting § 5318(g)(3) over the past several decades, lead us to conclude that § 5318(g)(3) provides protection for reports made to state and local law enforcement. Accordingly, we

must now consider whether a special ranger of the TSCRA qualifies as state or local law enforcement.

*iii.*

Like the bankruptcy court before us, we turn to Texas state law to assess the role and authority of these special rangers. As explained *supra* Part I, Special Ranger Dickson was employed by the TSCRA when FSBBW contacted him about the potential theft of its collateral—the cattle.

Under Texas law, the director of the Department of Public Safety can appoint "special rangers who are employed by the TSCRA to aid law enforcement agencies in the investigation of the theft of livestock or related property." TEX. CODE CRIM. PROC. art. 2.125 (a). With the noted exception of the power to issue traffic tickets, article 2.125 of the Texas Code of Criminal Procedure grants these special rangers the power to "make arrests and exercise all authority given peace officers under this code when necessary to prevent or abate the commission of an offense involving livestock or related property." *Id.* art. 2.125(b). In addition to other requirements, these special rangers must meet the same standards for certification as other peace officers as set forth by the Texas Commission on Law Enforcement. *Id.* art. 2.125(e)(4). Article 2A.001 of the Texas Code defines peace officers as including rangers appointed by the Director of the Department of Public Safety. *Id.* at art. 2A.001 (4).

Based on Texas's statutory framework, we agree with the bankruptcy court's conclusion that special rangers, who have the same powers as peace officers when investigating their area of authority (theft of livestock or related property), are considered law enforcement for the purposes of the § 5318(g)

No. 24-40368

safe harbor.[6] Special Ranger Dickson appears to have been acting within his purview as a law enforcement officer when FSBBW informed Dickson that Kerns sold the cattle serving as security for its loan.[7]

*iv.*

For these reasons, the bankruptcy court did not err when it concluded that FSBBW's disclosure to Special Ranger Dickson fell within the §5318(g)(3) safe harbor of the Annunzio-Wylie Act.

B.

For the first time on appeal, Kerns argues that the bankruptcy judge, Judge Searcy, should have recused himself because he, when in private practice and prior to assuming the judgeship in 2021, represented a different creditor, Eastman Credit Union (Eastman), in the underlying bankruptcy proceedings in 2019.[8] Kerns' Chapter 7 bankruptcy case was filed on November 25, 2019. On December 12, 2019, then-lawyer Searcy filed a notice of

---

[6] We also note that in his deposition testimony, an exhibit to the motion for summary judgment, Special Ranger Dickson testified that he had been involved with hindering a secured creditor or similar cases "quite often," which further supports the conclusion of the bankruptcy court that Special Ranger Dickson was acting in his capacity as a law enforcement officer at the time FSBBW made its report to Special Agent Dickson.

[7] Kerns, proceeding pro se on appeal, has shifted his earlier argument and now contends that the special rangers were working outside their area of authority when they investigated Kerns and worked with the District Attorney regarding the charge of "hindering a secured creditor." We are not tasked with assessing the legality of the investigation that the special rangers or the District Attorney undertook after FSBBW made its disclosure to Special Ranger Dickson.

[8] In addition, Kerns alleges that a case administrator who works at the bankruptcy court is related by marriage to someone in the TSCRA involved in the investigation regarding the missing cattle and that a legal secretary who formerly worked for opposing counsel started working at the bankruptcy court. Kerns does not provide any persuasive reasoning or any caselaw as to why either allegation, if true, would serve as a basis for Judge Searcy to recuse.

appearance on behalf of Eastman, followed by a lift stay motion seeking to lift the automatic stay with respect to a 2017 Ford pickup truck. An agreed order was entered resolving the motion on January 22, 2020. And, on February 24, 2020, the court entered an order closing the bankruptcy case. The record does not show that then-lawyer Searcy had any other involvement in the case as counsel for Eastman.

Over a year later, Judge Searcy took the bench on March 1, 2021. When Kerns filed the adversary proceeding on December 31, 2021, the case was assigned to Judge Searcy. Kerns was represented by the same counsel in both the underlying bankruptcy case and the adversary proceeding.[9]

Kerns contends, for the first time in his pro se appeal brief dated August 29, 2024, that Judge Searcy should have recused, pursuant to 28 U.S.C. § 455(b)(2), which provides that any federal judge "shall disqualify himself"

> [w]here in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it.

The crucial phrase here is "matter in controversy." While Judge Searcy did not serve as a lawyer in the adversary proceeding, which he oversaw, he did serve as a lawyer in the original bankruptcy proceedings from which it arose. When tasked with addressing what constitutes "the matter in controversy," courts have taken divergent views, from very narrow—the case and docket number in front of the court—to broader interpretations—assessing whether the cases in question are "closely related." *See Philip Morris USA Inc. v. United States Food & Drug Admin.*, 156 F. Supp. 3d 36, 43 (D.D.C. 2016)

---

[9] The same attorney also represented Kerns during the appeal to the district court.

No. 24-40368

(analyzing and collecting cases and secondary sources); *see also* Richard E. Flamm, *Judicial Disqualification: Recusal and Disqualification of Judges* §39.3 (3d ed. 2017) (explaining that the term "matter in controversy" is not defined in the statute or the Judicial Code and its meaning "is often a source of some dispute"). Our court has not yet defined the term, and we need not do so today.

FSBBW argues that Kerns forfeited his recusal argument by failing to raise it in front of the bankruptcy court or the district court, while Kerns contends that he was unaware of Judge Searcy's involvement in his underlying bankruptcy case "until after proceedings had commenced."

Our court has held that "when the party seeking recusal knows or should know of the facts on which recusal is based he must make a timely motion to disqualify or lose his right to do so." *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 802 (5th Cir. 1986), *aff'd*, 486 U.S. 847 (1988). Judge Searcy's involvement in Kerns' Chapter 7 proceedings was not hidden as then-lawyer Searcy filed pleadings on the public docket and negotiated an agreed order with Kerns' counsel. And, while Kerns is now proceeding pro se, that does not excuse his prior failure to raise the issue, as he was represented by counsel throughout the bankruptcy court and district court proceedings, including in the negotiation of the agreed order with then-lawyer Searcy. Because Kerns knew or should have known of Judge Searcy's involvement in his underlying Chapter 7 bankruptcy proceedings when his adversary proceeding was assigned to Judge Searcy on December 31, 2021, and because Kerns failed to raise it until his appellate brief, Kerns has forfeited this argument.[10]

---

[10] Even assuming § 455(b)(2) is broad enough to encompass the prior bankruptcy proceeding *and* that Kerns hadn't forfeited this argument, any alleged breach of the duty to recuse would have been harmless. *See Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 485 (5th

No. 24-40368

\* \* \*

For the foregoing reasons, we AFFIRM summary judgment.

———————————————

Cir. 2003). The bankruptcy court's order granting summary judgment was subject to two levels of de novo review, by us and the district court, which concluded the bankruptcy court's analysis was legally correct. *See In re Cont'l Airlines Corp.*, 901 F.2d 1259, 1263 (5th Cir. 1990) ("The risk of injustice to the parties in allowing a summary judgment ruling to stand is usually slight. Such rulings are subject to de novo review, with the reviewing court utilizing criteria identical to that used by the court below. In cases where we would otherwise affirm such a ruling, little would be gained by vacating and remanding with instructions that it be essentially reinstated.").